## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**JESUS GONZALES,**

      **Plaintiff,**

**v.**                          **Case No. 4:21-cv-00004-WS-MJF**

**FLORIDA DEPARTMENT OF
CORRECTIONS; OFFICER
HERMAN SAPP; and OFFICER
ANGELA ADAMS,**

      **Defendants.**

_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT
## AND INCORPORATED MEMORANDUM OF LAW

Defendants, FLORIDA DEPARTMENT OF CORRECTIONS, OFFICER HERMAN SAPP, and OFFICER ANGELA ADAMS (hereinafter collectively "Defendants"), by and through their undersigned counsel, and pursuant to Rule 56(c), Fed. R. Civ. P., hereby move this Court to enter summary judgement in their favor as to the following counts of Plaintiff's Complaint:

**<u>Count I</u>** – Failure to Train and Supervise (42 U.S.C. §1983), against Defendant Florida Department of Corrections (hereinafter "FDOC").

1

**Count II** – Deprivation of Civil Rights (42 U.S.C. §1983), against Defendant FDOC.

**Count III** – Deprivation of Civil Rights (42 U.S.C. §1983), against Defendant HERMAN SAPP.

**Count IV** – Deprivation of Civil Rights (42 U.S.C. §1983), against Defendant ANGELA ADAMS.

There are no *genuine* issues of material fact, and the Defendants are entitled to summary judgement as a matter of law.

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

This case arises from an incident that occurred on January 4, 2017.[1] Former FDOC inmate Santos Maldonado attacked and wounded Plaintiff Jesus Gonzales at Northwest Florida Reception Center. At all relevant times, Defendants HERMAN SAPP and ANGELA ADAMS were employees of FDOC, and are current employees of FDOC.

Plaintiff alleges that the January 4, 2017 incident was a result of Defendants' actions and/or inactions and brings claims pursuant to 42 U.S.C. §1983. Plaintiff does not allege any additional or subsequent alleged instances of civil rights violations other than the January 4, 2017 incident. Plaintiff filed his Complaint with

---

[1] Plaintiff's Complaint erroneously states that the incident in question occurred on January 5, 2017. It is completely implausible that this incident occurred on January 5, 2017 as opposed to January 4, 2017, for the reasons outlined below.

2

this Court on January 5, 2021. Defendants are entitled to summary judgement as a matter of law because Plaintiff filed his Complaint outside of the four-year statute of limitations.

## II.    STATEMENT OF FACTS

### A. <u>Establishing the Date of Incident</u>

Plaintiff filed this lawsuit on January 5, 2021. *Docket #1*. On January 4, 2017, the day of the incident in question, Plaintiff was incarcerated at Northwest Florida Reception Center (hereinafter "NWFRC"), a correctional institution operated by Defendant FDOC and located in Chipley, Florida. NWFRC contains eight dorms for housing inmates. Plaintiff was assigned to B-dorm. Former-inmate Santos Maldonado was also incarcerated at NWFRC on the date of the incident. He was assigned to H-dorm.

On that same day, Defendants HERMAN SAPP and ANGELA ADAMS were assigned to work the night shift at NWFRC. This shift would begin on January 3, 2017 at 6:00 p.m. and would end on January 4, 2017 at 6:00 a.m. *Ex. 1, NWFRC Shift Roster January 3-4, 2017 through January 4-5, 2017*. Defendant ADAMS was assigned as the housing sergeant for B-dorm, while Defendant SAPP was assigned to escort duty. *Ex. 1*.

SAPP and ADAM'S January 3 - 4, 2017 assignments coincide with the allegations made in the Complaint, namely that SAPP was assigned to escort duty

while ADAMS was assigned to B-dorm. ¶14, 21, *Complaint.* SAPP and ADAM'S
January 4 - 5, 2017 assignments do not coincide with the allegations made in the
Complaint, as on that day SAPP was assigned to B-dorm and ADAMS was assigned
to A-dorm, which means they would not have been involved or present for the
incident between Plaintiff and Maldonado as it was described in the Complaint. *Ex.
1.*

On January 4, 2017, at approximately 1:38 am, Maldonado attacked Plaintiff
while Plaintiff was lying in his bunk inside B-dorm. This attack was captured on
fixed-wing security camera. *Ex. 2, Surveillance Video of B-Dorm.* The security
camera footage contains a date and timestamp, which places the date of the incident
on January 4, 2017 at 1:38 am. This can be seen in the upper left-hand corner of the
video footage. The date and time are automatically generated by the Digital Video
Recording (DVR) system, and the DVR system itself is checked regularly for
accuracy. *Ex. 3, John Louthan Affidavit.* This footage was identified by Plaintiff as
accurately depicting the day that he was attacked. *Ex. 4, Plaintiff's Deposition, 21:5
– 22:7.*

As a result of this incident, the officers involved wrote Incident Reports, in
which they record their recollections. These Incident Reports were generated the
same day as the incident. They contain the statements of Defendants SAPP and
ADAMS, as well comments from Captain William Jenkins, the supervising officer

4

on the January 3-4, 2017 shift. All of the incident reports place the date of the incident on January 4, 2017. *Ex. 5, Herman Sapp's Incident Report; Ex. 6, Angela Adams' Incident Report.*

Plaintiff's injuries were treated at the NWFRC infirmary. There are several medical records that document his treatment, including a 23-hour Observation Nurses Note and a Chronological Record of Health Care. *Ex. 7, Plaintiff's Medical Records, NWFRC Infirmary*. Some of these records incorrectly state the date of injury as January 5, 2017. In some instances, the same note contradicts itself with regards to the date. In others, it appears that the author of the note originally wrote the date as January 4, 2017, but then wrote over it as January 5, 2017.

However, all other documentation, including the automatically generated timestamps on the fixed wing security footage, points to the date of incident being January 4, 2017.

Plaintiff had knowledge that the date of incident was January 4, 2017, as evidenced by his original pre-suit notice, dated July 12, 2019. *Ex. 8, Plaintiff's July 12, 2019, Pre-suit Notice.*

## B. Inmate-on-Inmate Attack Involving Plaintiff Jesus Gonzales

In the early morning of January 4, 2017, Plaintiff was being housed in B-dorm at NWFRC. At approximately 1:00 am, officers at NWFRC began the process of waking up and preparing inmates who had medical callouts. Some inmates are

woken up for medical callouts late at night or in the early morning, for procedures such as blood draws. *Ex. 9, Sapp's Deposition, 8:24 – 9:18.* One of the medical callout inmates was Santos Maldonado, who was housed in H-Dorm.

ADAMS, the assigned B-Dorm housing sergeant, woke up the one medical callout inmate she had that night. *Ex. 10, B-Dorm Housing Logs.*

At approximately the same time, SAPP, who was assigned to escort duty, began to make his rounds to each dorm to pick up the callouts and escort them to medical. *Ex. 9, Sapp's Deposition*, *10:9 – 20.* Also on escort duty was Officer Michael Thomas. *Ex. 9, Sapp's Deposition, 9:19 - 21.* Officers escorting medical callouts need to pick up inmates from seven separate dorms, escorting them in a group to the medical facility. The number of medical callouts that night was around twenty or more. *Ex. 9, Sapp's Deposition, 13:13 – 19.* Each of the dorms at NWFRC are separate buildings connected by an outdoor path.

The medical callouts were escorted to the medical facility without incident. SAPP and Officer Thomas then proceeded to escort the inmates back to their dorms.

> Q:    Okay. On the night the incident took place, when the incident took place, was it after you took Mr. Maldonado to medical or before?
>
> A:    After.
>
> Q:    Okay. So can you tell me what happened after you took Mr. Maldonado to medical and you were escorting him back?

A:     We line up all the inmates when they're all done, and there is one

of us in the front, one of us in the back. That's how we do a proper escort

and we – we escort them down the compound. The compound splits off

on either side, we have inmates going to A dorm, B dorm,

and C dorm, they would go off to the right. The ones going to Hotel[2]

would go off to the left because the dorms sit like this. A and B is over

here, Hotel is over here. When you come down the center of the

compound, A and B and C veers off to the right, Hotel veers off to the

left.

*Ex. 9, Sapp's Deposition*, *10:21 – 11:13.*

SAPP made a call over his radio to the B-Dorm officers, ADAMS and Officer

Payne, to unlock the B-dorm doors so the returning medical callouts could enter. *Ex.*

*9, Sapp's Deposition*, *29:25 – 30:10.* Only Officer Payne heard SAPP's call over the

radio, because at that time ADAMS was walking through the bunks waking up

inmates for food service. She had her radio turned down at this time, as not to disturb

the sleeping inmates. *Ex. 11, Adams' Deposition, 18:6-17.* ADAMS then returned to

the officer's station. The officer's station is a separate, windowed room located in

B-dorm, where all the controls are located. It is separated from the rest of the dorm

---

[2] In the testimony of this case, the dorms at NWFRC are interchangeably referred to by letters or by their codes. For example, H-dorm is Hotel and B-dorm is Bravo.

by two sets of doors. At this time, either ADAMS or Officer Payne pressed the button, located in the B-dorm officer's station, to unlock the doors.[3]

It was at this point that inmate Maldonado entered B-dorm, by following behind the B-dorm medical callout through the B-Dorm side door. Maldonado eased the door shut so that it would not latch and lock him inside B-dorm. ADAMS reacted immediately when she realized there was an inmate who did not belong in B-dorm. Maldonado attacked Plaintiff and ran out of B-dorm before ADAMS had time to even exit the officer's station.

> Q:     Okay. And do you know how he was able to get in through the side door?
>
> A:     He came in with an inmate that was returning from a callout.
>
> Q:     And was it just one inmate that was returning from the callout?
>
> A:     On that side, yes.
>
> Q:     And did you see him enter that -- enter the door?
>
> A:     I did not see him enter the door, but when I asked the officer that was with me if my inmate had returned from his callout, he told me that both of them had, and I told him, I said, "Well, I only released one" and

---

[3] Angela Adam's and Randolph Payne's deposition testimony conflicts on who actually pressed the button to unlock the B-dorm doors. *Ex.11 Adams' Deposition, 11:4-6; Ex. 12, Payne's Deposition 15:13-18.* Unlocking the doors is not a duty that is assigned to any single housing officer, and either Adams or Payne could have unlocked the doors without it being a violation of FDOC policy. *Ex.11 Adams' Deposition, 18:23 – 19:6.*

when I turned my head and looked at the door, Maldonado was easing the door closed so that it would not lock.

Q:     Okay. And what did you do at that point?

A:     I got up because me and him made eye contact, I got up out of my chair, and he ran straight to inmate Gonzalez. So, I went to see where he went, and within seconds he was back out the door.

*Ex. 11, Adams' Deposition, 9:18 – 10:13.*

ADAMS immediately to radioed SAPP that there was an inmate who did not belong in B-dorm, and that he needed to be apprehended.

Q:     Okay. And did you do anything else when you saw him?

A:     I radioed for the outside when Maldonado exited to catch the inmate that just exited the dorm.

*Ex. 11, Adams' Deposition, 10:17 – 10:20*

Q:     So what happened after Mr. Maldonado went into the B dorm?

A:     Once we had the inmates that went to A and B and the ones went to Hotel and went back, we moved the line because we have to go farther down the compound. So we moved the line down to where Delta, Echo, and Foxtrot can go back, so at that time, I get a call on the radio that there is an extra -- or an inmate has entered in on Bravo dorm side 2 that didn't belong.

9

*Ex. 9, Sapp's Deposition*, *14:4 – 12.*

According to the surveillance footage, Maldonado first entered B-dorm at approximately 1:38:10 am, and can be seen approaching Plaintiff's bunk. *Ex. 2, Surveillance Video of B-Dorm*. At 1:38:17 am, Maldonado can be seen at Plaintiff's bunk. At 1:38:20 am, Maldonado can be seen running away from Plaintiff's bunk, and at approximately 1:38:23 am, he exits B-dorm. The entire incident took approximately thirteen seconds. [4]

Maldonado was almost immediately apprehended by SAPP, who placed Maldonado in handcuffs. *Ex. 9, Sapp's Deposition*, *14:4 – 16.* Sapp then escorted Maldonado to medical for a pre-confinement assessment, and then to confinement (isolated single cell). *Ex. 9, Sapp's Deposition*, *19:16 – 20:2.*

At this same time, ADAMS entered the B-dorm floor to ascertain what had occurred. Once ADAMS discovered that Plaintiff had been stabbed, he was immediately taken to medical for treatment. *Ex. 11, Adams' Deposition, 13:4 - 14:6.*

Plaintiff denies knowing what motivated Maldonado's attack and denies having any prior contact or relationship with Maldonado prior to this attack. *Plaintiff's Deposition, 22:14 – 24:3.* There is no evidence that any of the involved

---

[4] All timestamps are taken from *Exhibit 2*, the fixed wing video footage of B-dorm from the night of the incident.

correctional officers had prior knowledge of Maldonado's plan to attack Plaintiff, or that they had any reason to suspect that Maldonado wanted to attack Plaintiff.

Inmate-on-inmate attacks do occur at every prison facility. However, to the knowledge of all the involved individuals, including Plaintiff, this is the first time an inmate-on-inmate attack had been perpetrated in this manner at NWFRC. While inmates at NWFRC do go into unauthorized dorms during the day, when they have freedom of movement, this was the first time this had occurred during nighttime medical callouts. *Ex. 9, Sapp's Deposition, 18:13 – 24; Ex. 11, Adams' Deposition,19:7 – 21.*

> Q:    From what you can remember at Northwest Florida
>
> Reception Center, had anyone snuck into a dorm they weren't
>
> supposed to be in the middle of the night during a call-out?
>
> A:    Never. I never heard of that. If it did happen, I
>
> mean, not while I was there. Definitely I know for a fact
>
> not while I was there.

*Ex. 4, Plaintiff's Deposition 30:17 – 22.*

There is no evidence in the record that, prior to this incident on January 4, 2017, any inmate at NWFRC had been able to enter a dorm unauthorized during nighttime medical callouts and attack a fellow inmate.

## MEMORANDUM OF LAW

### III.    SUMMARY JUDGEMENT STANDARD

A motion for summary judgment should be granted when the moving party shows that "…there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted); Fed. R. Civ. P. 56(c).   An otherwise correctly supported motion for summary judgment cannot be defeated simply due to the existence of some factual disputes between the parties.  The precise requirement is that there be "no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986).

### IV.    ARGUMENT

### A.  **All counts must be dismissed due to Plaintiff's failure to file suit within the applicable statute of limitations.**

In this case, there is no *genuine* issue of material fact regarding when this incident occurred, meaning no reasonable jury could find that the incident occurred any other date other than January 4, 2017. *Id.* The overwhelming amount of documentation points to this incident occurring on January 4, 2017, with the best evidence being the surveillance video footage with the automatically generated date and timestamps.

Plaintiff filed this suit on January 5, 2021, after the applicable 4-year statute of limitations had lapsed. In Florida, "[a] four-year statute of limitations applies to such claims of deprivation of rights under 42 U.S.C. §§ 1983 and 1985." *Chappell v. Rich*, 340 F.3d 1279 (11th Cir. 2003). While Plaintiff has brough a federal cause of action, "federal law looks to the law of the State in which the cause of action arose. This is so for the length of the statute of limitations: It is that which the State provides for personal-injury torts." *Wallace v. Kato*, 549 U.S. 384, 127 S. Ct. 1091 (2007). The applicable Florida statute for personal-injury torts would be Section 95.11(3), Florida Statutes, which provides a four-year statute of limitations.

While the applicable statute of limitations in this case is a matter of Florida law, when the cause of action accrued is a matter of federal law. *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987). In this case, the cause of action accrued on January 4, 2017, at the moment that Plaintiff was attacked by Inmate Maldonado, as that is the moment that 'Plaintiff [knew] or has reason to know that he [had] been injured" and was "aware or should have been aware who [had] inflicted the injury." *Id.*

The 11th Circuit has held in cases similar to the current case, where the basis of the allegations is an inmate-on-inmate assault, that the cause of action accrues on the moment of the assault. While it was applying the Georgia statute of limitations rather than Florida's, the court in *Thompson v. Corrections Corporation of America*

stated that "[plaintiff's] deliberate indifference claim accrued as a matter of federal law in September of 2007, **when he was assaulted by the other inmate.**" 485 F. App'x 345 (11th Cir. 2012) [*emphasis added*].[5]

**B.  <u>Count I should be dismissed, because Plaintiff has failed to demonstrate that FDOC was aware of a deficiency in training or supervision.</u>**

In Count I, Plaintiff alleges failure to train and supervise against Defendant FDOC. A government entity can be held liable for failure train or supervise to  when its employees cause a constitutional injury as a result of the entity's policy or custom-based failure to adequately train or supervise its employees.  *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1888 (11th Cir. 2011), citing *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998).

To show that FDOC failed to train or supervise in this case, Plaintiff must prove the following elements:

1.  That a specific officer or officers violated his constitutional rights.

2.  That those same individuals were inadequately trained or supervised.

3.  That FDOC had **notice** of this inadequate training or supervision, by showing at least one prior instance of a constitutional violation **similar to the violations alleged in this case**.

---

[5] Although an unpublished opinion is not binding, it is persuasive authority. *United States v. Futrell*, 209 F.3d 1286, 1287 (11th Cir. 2000).

4.  That FDOC made a deliberate choice to not train or supervise its employees.

*AFL-CIO v. City of Miami*, 637 F.3d 1178, 1188-89 (11th Cir. 2011); *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998).

Plaintiff cannot point to any evidence showing that he meets the elements outlined above. Specifically, Plaintiff cannot show a single instance of an attack occurring in a similar manner to the one perpetrated by Maldonado. Plaintiff has testified that, to his knowledge, no similar attacks have occurred at NWFRC prior to this incident. Therefore, he is unable to show how FDOC could have been on notice of a failure to train or supervise its employees in this regard. "Establishing notice of a need to train or supervise is difficult." *AFL-CIO* at 1189. Plaintiff is unable to meet this difficult hurdle.

**C.  Count II should be dismissed, because Plaintiff has failed to demonstrate that FDOC custom, policy, or procedure caused a violation of his constitutional rights.**

In Count II, Plaintiff makes a general, boilerplate allegation of deprivation of civil rights, alleging that Defendant FDOC violated his Fourth, Eighth, and Fourteenth Amendment rights. ¶41, *Complaint*.

A government entity may not be held liable under § 1983 without finding that an individual employee of that entity violated the plaintiff's constitutional rights. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1170-71 (11th Cir. 2009).  If there

is no constitutional injury, the analysis comes to an end, and Plaintiff's claims fail as a matter of law. *Id.*

Defendants argue below that there was no constitutional injury by any individual FDOC employee. However, assuming that there is a constitutional injury, a government entity may only be held liable under §1983, when one of its policies **caused** the constitutional injury. *AFL-CIO v. City of Miami, Fla.*, 637 F.3d 1178, 1187 (11th Cir. 2011), citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978). It is not sufficient for the policy to be tangentially related to the constitutional injury, rather it must be the moving force behind the injury. *Id.* The policy must have caused the government employee to violate Plaintiff's constitutional rights. *Id.*

When determining whether Plaintiff has met the burden of causation, the Court must use a two-step analysis.

1. The Court must determine if FDOC's policy is **facially unconstitutional**. If so, this makes it much more straightforward for Plaintiff to show causation.

2. If the policy is facially lawful, determining causation is much more difficult. Plaintiff must establish that the FDOC acted in a manner that is **deliberately indifferent** to **known or obvious** consequences. *Id.*

Plaintiff has not alleged that the policies at issue in this case are facially unlawful. Instead, Plaintiff has alleged that FDOC has acted with "deliberate indifference." ¶39, *Complaint*. Plaintiff is unable to show that FDOC acted with deliberate indifference to a known or obvious consequence. Discovery has clearly established that an attack such as the one on Plaintiff had not occurred before at NWFRC. Even assuming that there is a flaw in FDOC's security policies, FDOC had no prior knowledge or notice that its policies would lead to the type of harm suffered by Plaintiff.

**D. <u>Count III and IV should be dismissed, because Plaintiff has failed to demonstrate that Defendants SAPP and ADAMS where aware of any danger or responded inappropriately to the incident.</u>**

In Counts III and IV, Plaintiff's again makes a general, boilerplate allegations of deprivation of civil rights, alleging violations of the Fourth, Fifth, Eighth and Fourteenth Amendments. ¶46, 54 *Complaint*.

Plaintiff's Complaint makes the following identical, conclusory allegations against Defendants SAPP and ADAMS:

"[SAPP/ADAMS] while acting under color of law, deprived Plaintiff of his civil rights under the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution when [he/she] subjected him to cruel and unusual punishment and acted with deliberate indifference and reckless disregard

17

toward Plaintiffs right to be free from unreasonable seizures, and afforded due process of law…"

¶ 46, 54 *Complaint.*

However, Plaintiff's Complaint goes on to make the following factual allegations against both SAPP and ADAMS:

1. That SAPP and ADAMS allowed Maldonado into Plaintiff's dorm without searching him knowing that Maldonado would likely cause harm to Plaintiff or other inmates.

2. SAPP and ADAMS allowed Maldonado in B-Dorm knowing that the B-Dorms inmates were sleeping and unable to defend themselves.

3. SAPP and ADAMS failed to protect Plaintiff from Maldonado's attack.

4. SAPP was aware of the threat Maldonado posed to Plaintiff based on Maldonado's "high security level and concurrent combative and aggressive behavior known to SAPP prior to transporting Maldonado."

5. ADAMS did not properly observe or protect Plaintiff from Maldonado, and stood by while the attack took place.

¶ 46.a-c, 47, 54.a-b, 55 *Complaint.*

Given the substance of these factual allegations, Plaintiff is essentially claiming failure to protect in violation of his Eighth Amendment Rights. Plaintiff has not alleged facts showing that SAPP and ADAMS harmed him through

excessive force. Nor has he alleged facts showing that they unconstitutionally restrained his personal liberty. Plaintiff has testified that he is not alleging that SAPP and ADAMS intentionally attempted to harm him.

> Q:     So you're not saying they did anything deliberate to hurt you, right?
>
> A:     No. I'm not -- I'm not saying that. I'm saying that they just didn't do their job. And because of them -- the neglection of their job, it could have cost me my life.

*Ex. 4, Plaintiff's Deposition 53:2 – 6.*

For cases involving an inmate-on-inmate attack, the legal standard for federal civil rights liability against correctional officers outlined in *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). Under *Farmer*, correctional officers have a duty to protect inmates from attacks by other inmates. "It is not, however, every injury suffered by one prisoner at the hands of another that translates into a constitutional liability for prison officials responsible for the victim's safety." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

To establish a § 1983 claim for violation of an inmate's Eighth Amendment rights, Plaintiff must show the following elements:

1. A substantial risk of serious harm.

2. The defendant's deliberate indifference to that harm.

3.  Causation.

*Id*., citing *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995).

"Substantial risk of serious harm" has been interpreted to mean that "there must be a 'strong likelihood' of injury, 'rather than a mere possibility,' before an official's failure to act can constitute deliberate indifference." *Estate of Owens v. GEO Grp., Inc,* 660 Fed. Appx. 763, 767 (11th Cir. 2016), quoting *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990). Furthermore, the alleged risk "must be actual, rather than potential or speculative." *Id.* Just because a prisoner is exposed to the *potential* for an attack "does not, in and of itself, constitute substantial risk of harm." *Id.*

The United States Supreme Court has defined "deliberate indifference" in this context to mean "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer* at 837. The correctional officer must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* Therefore, deliberate indifference requires: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) conduct that amounts to more than mere negligence." *Estate of Owens v. GEO Grp., Inc,* 660 Fed. Appx. 763, 767 (11th Cir. 2016), citing *Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).

20

In applying the subjective component of the analysis, Plaintiff's claims must fail if Defendants SAPP and ADAMS had no actual knowledge of the substantial risk Maldonado posed to Plaintiff. *Estate of Owens*, 660 Fed. Appx. at 767, *see Farmer*, 511 U.S. at 837-38.

Furthermore, even if SAPP and ADAMS knew of the substantial risk to Plaintiff's safety, they may be found free from liability if the Court finds they responded reasonably to the risk, even if the attack was ultimately not averted. *Farmer* at 844.

Plaintiff cannot prove that SAPP and ADAMS were subjectively aware of the possibility of Maldonado attacking Plaintiff, much less that they intentionally disregarded that risk. Both individual defendants have stated under oath that to their knowledge, no such attack had been perpetrated at NWFRC. Neither officer was aware of any connection or relationship between Plaintiff and Maldonado that would have motivated such an attack. Plaintiff himself testified that he had no relationship with Maldonado and did not know the motivations behind the attack.

Furthermore, both officers responded reasonably to the incident. As she testified under oath, ADAMS moved immediately to stop Maldonado the moment she realized that he had entered the incorrect dorm. SAPP immediately moved to apprehend Maldonado when he received the call on the radio stating that there was an incident and did so right outside B-dorm.

21

**E.** **Counts III and IV should be dismissed, because Defendants SAPP and ADAMS are entitled to qualified immunity.**

In light of the facts and arguments outlined above, Defendants SAPP and ADAMS are entitled to qualified immunity. Courts must utilize a two-part framework to evaluate qualified immunity claims. *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). The two stages of inquiry are:

1. Whether the plaintiff's allegations, if true, establish a constitutional violation.

2. Whether the constitutional right was "clearly established."

*Id.*

This two-part inquiry may be done in whatever order is deemed most appropriate by the Court. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 821, 172 L. Ed. 2d 565 (2009). Plaintiff has failed to meet the second prong of the inquiry. The rights he is alleging were violated are by no means clearly established. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151 (2001), citing *Anderson v. Creighton*, 483 U.S. 635, 107 S. Ct. 3034 (1987).

22

No officer involved in this incident, nor Plaintiff himself, were under notice of the possible danger that Maldonado posed to Plaintiff, nor of the possible danger of any inmate entering an unauthorized dorm during nighttime medical callouts. Therefore, SAPP and ADAMS reasonably believed that they were not in violation of Plaintiff's rights.

## V.    CONCLUSION

Defendants FDOC, SAPP, and ADAMS hereby move this Court to enter final summary judgment against Counts I through IV. Plaintiff's suit was filed outside the four year statute of limitations. Defendants had no prior notice or knowledge of any danger that inmate Maldonado posed to Plaintiff, and all individual defendants acted reasonably and according to policy and procedure. Finally, all individual defendants are entitled to qualified immunity.

WHEREFORE, the Defendants respectfully request this Court enter final summary judgment in their favor and grant such other relief as the Court deems proper.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

Undersigned counsel hereby certifies that this motion and incorporated memorandum of law contains 4,922 words, excluding the case style, signature block, and certificate of service. The foregoing word count has been calculated utilizing

Microsoft Word, the word processing software used to prepare this motion and incorporated memorandum of law.

Respectfully submitted,

/s/ Liane S. LaBouef
Liane S. LaBouef
Florida Bar No. 1025198
Howell, Buchan & Strong
2898-6 Mahan Drive,
Tallahassee, Florida 32308
Telephone: (850) 877-7776
Email: liane@jsh-pa.com
*Attorney for Defendants*
*Florida Department of*
*Corrections, Officer HERMAN SAPP,*
*and Officer ANGELA ADAMS*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all counsel of record by CM/ECF this 15th day of September, 2021.

/s/ Liane S. LaBouef
Liane S. LaBouef

24